McCarroll v. Grand Lodge of the I. O. O. F. of Arkansas.

Opinion delivered June 26, 1922.

Charities—cy pres doctrine applied.—Under Stat. 43 Eliz., c. 4, establishing the *cy pres* doctrine applicable to charitable bequests, where a testator disinherited his heirs and devised certain land as a site for an orphans' home to be under the direction of a certain benevolent order, and the rest of his property to establish and maintain a sanitarium to be under the control of the same

lodge, after a compromise of a contest of the will by which the lodge obtained land and property insufficient to carry out the purposes of the devise, in view of the fact that the land was bringing in a small income and depreciating in value, a decree of specific performance of a contract of sale of the land and that the proceeds - be applied to the upkeep of a home for widows and orphans maintained by the same order for charitable purposes was proper.

Appeal from Lawrence Chancery Court, Eastern District; *Lyman F. Reeder,* Chancellor; affirmed.

*W. E. Beloate,* for appellant interveners.

The will creates two charitable trusts, first, a sanitarium fund for treatment of diseases, and, second, a site for an orphans' home by providing certain described lands, known as the Robbins farm, as the *situs.* These are recognized by our courts as "charities" and entitled to protection as such. 97 Ark. 532.

Under a will ordered to trustees for a public charity, with or without prohibition therein against a sale, if a sale would defeat the object of the charity, the trustees would have no power to sell. *Id;* 17 Ark. 483; 79 Ark. 550; 86 Ark. 218.

The decree with reference to the charity for sanitarium purposes should be reversed for want of proper parties, as there is no one in court representing them or asking any relief. 34 Ark. 391.

When trustees, with knowledge of the charitable use, and there being no reasonable excuse for mistake, have misappropriated the whole or any part of the income, they will be held to account for it during the whole period of the misappropriation. The trustees must carry out the scheme outlined by the donor. 10 Allen, 98; 128 Mass. 258.

The *cy pres* doctrine is not now recognized in many of the States, and where recognized it applies only where an apparent charitable intention has failed. It is not applicable so long as the original scheme of the testator is applicable. 87 Me. 414; 3 Gray 280; 151 Mass. 364.

The collateral heirs had no interest. There was no condition that would warrant their intrusion. 5 Wall. (U. S.) 119; 17 Ark. 483; 2 Barb. Ch. (N. Y.) 242-290. Nonuse of the trust property does not forfeit to the grantor heirs. 5 A. & E. Enc. 915, sub. 2 V.

*Z. M. McCarroll, pro se.*

Adopts brief of intervener pertaining to the Robbins farm, and says that the May Bryant judgment of $10,000, pleaded by the plaintiff, is one of the probate court, and as Shirey has been dead for more than 12 years, the same cannot be asserted against the lands. 37 Ark. 155; 79 *Id.* 570.

*A. H. Rowell, H. W. Applegate* and *Samuel M. Casey,* for appellees.

1. The chancery court had jurisdiction because (1st) this is a suit for specific performance against Z. M. McCarroll, and (2d), it calls for a construction of the will of W. A. Shirey.

2. The decree of the court below may be justified on either of two grounds, viz: (1) The decree of the chancery court in 1910 wherein these lands were set apart to the grand lodge in a suit where all the heirs of A. W. Shirey, and the widow, were parties, in which decree these lands to the grand lodge to be used as it deemed best. (2) Under the *cy pres* doctrine. This doctrine is well established in the jurisprudence of this country, and has received the favorable recognition of most of the States which have had occasion to pass on it. Perry on Trusts, 6th ed., § 723; *Id.* 725; 2 Story, Equity Jurisprudence, 14th d. §§ 1557, 1571; I Words and Phrass, 1189; 79 Atl. 837, 76 N. H. 96; 82 Atl. 435; 109 Me. 32; 95 S. W. 369, 375, 196 Mo. 234; 3 L. R. A. (N. S.) 237-238; 217 N. Y. 454, 112 N. E. 177; Ann. Cases, 1917-E, 853; 5 R. C. L. "Charities" 364-370, § 113; 11 C. J. 358-364.

SMITH, J. This appeal involves the construction of the will of A. W. Shirey, the relevant portions of which are as follows:

"KNOW ALL MEN BY THESE PRESENTS:

"That I, Arthur W. Shirey, being of sound and disposing mind and memory do make, publish and declare the following to be my last will and testament, hereby revoking all testamentary dispositions heretofore made viz:

"1.   It is my desires and will that all my just debts be paid by my executors.

"2.   I give, devise and bequeath to all persons who upon my death if dying intestate would be entitled under the law to any share or interest in my property, either real or personal, each the sum of one cent in money, and no more.

"3.   I give devise and bequeath to Fair Bell Shirey who is now my wife one cent and no more.

"4.   I give and bequeath to each child born or hereafter born of said Fair Bell Shirey the sum of one cent and no more and more particularly I give, devise and bequeath to her child now born, the sum of one cent in money and no more, this child not having been begotten by me and it being unknown to me by whom begotten and the name so far as its Christian surname, nomen or cognomen is concerned of said child being to me unknown and said child is identified and named as fully and completely as above mentioned or my information can furnish a basis for so doing."

The testator then names the persons who would have been his heirs had he died intestate, and he gave to each of them "one cent and no more, to be paid in money."

After having thus disposed of all persons who would have taken an interest in his estate had he died intestate, the will reads as follows:

"8.   Subject to the payment of the foregoing bequeaths, I will, devise and bequeath to the Independent Order of Odd Fellows of the State of Arkansas all my property, boath real and personal, that I may have title to or any interest in at the time of my death in trust

perpetually for the following uses and purposes, to-wit: (a) All my property, boath real and personal, and the revenue and income thereof except the real estate hereinafter particularly described shall be used and devoted to the establishing and maintenance of a sanitarium under the perpetual management and control of said Grand Lodge of the Independent Order of Odd Fellows of the State of Arkansas. It is my will and dessies that this sanitarium be located and established and maintained at the city of Hot Springs, Arkansas, if that is expedient and practical, or otherwise at such place as shall be expedient and practicable in the judgment of said fraternal order herein named for the following purposes, in said sanitarium, I will and devise that all kinds of diseases be treated (except veneral diseases, such shall be excluded), under the controle of one electic physician and surgeon authorized by the board of the State of Arkansas to practice in said said State this physician and surgeon may be one and the same person, and he shall be acquainted with and approve the following methods of treating diseases and the magnetic treatment and the Yogi phylosophy and the Hindew Oriental phylosophy of curing diseases, electic treatment of diseases and Hypnotism as a treatment of diseases and Hydrophy cure in all its forms of baths and nature cure, cold and hot and all other forms and methods that are successful without drugs and medicines to be added and all future and newly developed methods of treating diseases without the use of drugs. I feel sure that humanity will be largely benefited as soon as these methods of treatment are adopted and the drug treatment abandoned. To this end I have appropriated all my life earnings, and I desire it to be so carried out and to the foregoing method of treatment I desire that baths of all kinds and descriptions be added to assist in eradicating the practitce of drug treatment for the human system. I believe that when my immortal self is in the Great Future Existence that I can and will return to earth to see what I have left for the good of humanity and

to assist in purfecting my plans which originated in me while in the body, and I have confidence in the Brotherhood of the Fraternal Order of I. O. O. F. that they will carry out my desier.

"(b) The following real estate situate in Lawrence County, Arkansas, to wit: All of the Roben farm the SW¼ section twenty-two (22), W½ NW¼ section 27, E½ NE sec 28 SW NE sec. 28, and NE SE sec 28, all in township 17 N. range 1 E. 400 acres and this is to be used as a location and site for an orphan's home to be established and maintained thereof under the perpetual controi of said Grand Lodge of the Independent Order of Odd Fellows of the State of Arkansas and for such purposes as may be expediently connected with said orphans' home for the good of that order, to-wit: To care for orphan children and learn them to work and economize, and that they may be educated for a practical business life a school in said home and that widows of sixty years old and been the wives of odd fellows in good standing be admitted to its fraternal protection all for the good of that order to carrie out and execute my expressed intentions herein above witnessed.

"It is my will, intention and devise that the executor or executors of this my last will and testament shall be such person as may be proposed by the Grand Lodge of the Independent Order of Odd Fellows of the State of Arkansas, and I do hereby appoint as the sole executor of this my last will and testament the persou who shall at the time of my death be the Grand Master of said Grand Lodge of the Independent Order of Odd Fellows, and he shall act as such executor until said fraternal order shall in its discretion recommend and appoint some other person or persons as such executor or executors."

The will was signed and duly attested, and there appeared thereon the following notation:

"I Desier and request each and every Odd Fellow in the State of Arkansas to pay into this sanitarium fund

not less than one nore more than Ten Dollars as a nominal sum merely to connect this entier fraternity with the interest and progress of this great institution set up for the health and longevity of our people and for the future good and well fair of all their families and for the future generation.   I respectfully solicit you all.''

The will was dated June 23, 1905, and on March 8, 1910, Shirey was assassinated.   Shirey left an estate which at the time of his death was supposed to be worth approximately $300,000, and had this sum been realized both the hospital and the orphanage mentioned in his will could have been established.

The widow promptly repudiated the will; and the collateral heirs, who had each been given one cent, prepared to contest the will on the ground that Shirey lacked testamentary capacity.   After a time the widow, the heirs, and the Grand Lodge of the Odd Fellows compromised their conflicting interests by a decree, under the terms of which the widow took 40 per cent. of the estate; the heirs 20 per cent.; and the Grand Lodge 40 per cent.   The widow, by a bill of review, sought to set aside this decree.  *Byrkett* v. *Grand Lodge,* 131 Ark. 476.

Many vicissitudes have attended this estate since this compromise decree was entered, and its appears there have been more than fifty lawsuits of different kinds concerning this property.   It appears that title to some of the lands has failed, and one very substantial judgment was recovered against the estate.  *Josephs* v. *Briant,* 115 Ark. 538; *Josephs* v. *Briant,* 108 Ark. 171.

The testator was assassinated, and the grand lodge undertook to discover the assassin, and for that purpose employed a well-known detective agency to investigate the case, and acting upon the investigation and report of that agency, caused the reputed assassin to be prosecuted.   This prosecution resulted in an acquittal, but a large expense was incurred in this investigation and prosecution.

The affirmative showing is made that the litigation in regard to the estate was unavoidable on the part of the grand lodge, and resulted from its effort to protect the estate and hold it intact.

At present the grand lodge claims title to about 2,100 acres of land, of which about 500 acres are in cultivation, and at the annual meeting of the grand lodge in 1921 a resolution was adopted directing the trustees of the grand lodge to sell these lands.

The lands were advertised in the newspapers of several cities, and after receiving and considering all the bids it was decided that the offer of Z. M. McCarroll was the highest and best bid, and a contract was entered into with him for the purchase of these lands. An abstract of the title was furnished, and upon an examination thereof McCarroll's attorney raised the objection to the title that the grand lodge had no right to sell.

Thereupon the officers and trustees of the Grand Lodge brought this suit in the chancery court to enforce the contract of sale. The jurisdiction of the chcancery court is predicated upon the ground, first, that this is a suit for specific performance of a contract, which is, of course, an established ground of equity jurisdiction. The court was asked also to assume jurisdiction upon the ground that it involved the construction of a will and sought to determine the scope of a trust, which is also a well recognized ground of equity jurisdiction. *Morris* v. *Boyd*, 110 Ark. 468.

The suit made the widow of one Odd Fellow and the orphan of another parties defendant as representatives of two of the classes of the beneficiaries under the will. These parties and all others filed answers, putting in issue all of the allegations of the complaint. Before the final submission of the cause one J. A. McCarroll, a member of the Grand Lodge of Odd Fellows, filed an intervention, and thereafter the lawsuit lost its characteristics as a friendly suit to try out the title.

J. A. McCarroll alleged in his intervention that the grand lodge, as trustee under the will, had been guilty of neglect of duty; that it had made no effort to carry out the trust, and had used funds derived from the Shirey estate for purposes not authorized by the will; that a contract had been made to sell the lands at a grossly inadequate price. He further alleged that it was practicable and feasible to erect the orphanage on the Robbins farm, and he prayed that the trustees be required to do so.

These issues were all inquired into and numerous witnesses testified, and we have a voluminous record before us, and it would protract this opinion to an undue length to attempt to review the testimony.

The decree contains a recital of the findings of fact made by the court, and we think the testimony supports these findings. We summarize them as follows: Shirey devised all of his estate to the Grand Lodge of the Independent Order of Odd Fellows as trustee for the purpose of erecting a sanitarium at Hot Springs and an orphans' home for indigent orphans and widows on lands known as the Robbins farm. Through no fault of the grand lodge, the larger part of this estate was lost to the grand lodge. On account of the small amount of property realized from said estate, the grand lodge, as trustee, is unable to carry out the provisions of the will of the testator by erecting either the sanitarium or the orphanage. The court found that before the death of the said Shirey the grand lodge had erected and was maintaining at Batesville, Arkansas, a home for widows and orphans of the same class and character as that mentioned in the will, and that it is still maintaining the same and intends to do so. That it is a charitable institution exclusively devoted to charity. That after the death of the said Shirey, in a certain proceeding and decree, as well as by a contract previously made with the collateral heirs the grand lodge was awarded the lands involved in this litigation, and all interest of the heirs and the widow was divested.

The court further found that at the annual meeting of the Grand Lodge a resolution was passed authorizing the sale of the lands, as the same were paying no dividends, with the intention and purpose of using the proceeds of the same for the support of the widows' and orphans' home at Batesville, and that it is the intention to use the proceeds of the sale to Z. M. McCarroll for that purpose.

The court found that the trustees of the grand lodge were duly authorized and empowered to sell the lands, and that, pursuant to this authorization, they had entered into a contract with Z. M. McCarroll for the sale of said lands for the sum of $52,000, and that the lands which are there described barely yield enough income to pay for the repairs and taxes and other expenses necessary to keep them up, and that they are depreciating in value, and will likely be lost to the grand lodge unless sold.

The court specifically found that, on account of the failure of the grand lodge to receive the title to all of the property devised to it, it is impossible to carry out the terms of the will as to the erection of a home on the Robbins farm, or a sanitarium at Hot Springs. But the court found that, if said property is used by the grand lodge for the support of the orphanage at Batesville, it will be used for a similar bounty and kindred charity to that designated in the will, and will be applied as near as possible to the objects and purposes intended by the said Shirey, and the court found this should be done.

The court decreed that the property could be sold and a good and fee simple title made thereto, and directed the defendant, Z. M. McCarroll, to comply with his contract by making the payments therein required. To this ruling and decree Z. M. McCarroll, the widow and the orphan who had been made parties as representatives of the classes to which they belonged, and J. A. McCarroll, the intervener, excepted, and have all appealed.

These findings of fact, in which we concur, dispose of the questions of fact raised in the pleadings; but the examining attorney insists that, notwithstanding these findings of fact, the court was without authority to direct the completion of the contract of sale when it was alleged and proved that the grand lodge did not intend, with the proceeds of the sale of the lands, to erect either the sanitarium at Hot Springs or the orphanage on the Robbins farm, but intended to consume the estate by expending the proceeds thereof on the orphanage at Batesville.

We have here a case where an estate, which the testator probably thought was worth $300,000, proves to be worth less than a fifth of that sum so far as its use for the purpose intended is concerned. It has become impossible to erect either the sanitarium or the orphanage. What becomes of the property devised to the grand lodge? And can the grand lodge sell the lands as it proposes to do? As has been shown, the compromise decree vested in the collateral heirs 20 per cent. of the estate as their share thereof, and in the widow and her son 40 per cent. thereof as their share, and the grand lodge took the remaining 40 per cent., and the necessary effect of this decree was to vest this 40 per cent. in the grand lodge free from any claim of the widow or the collateral heirs.

It is quite obvious that this compromise decree gave to both the widow and the collateral heirs an interest which the testator did not intend them to have. It is equally obvious that the testator intended to devote his entire estate to charity; but for the reasons stated this cannot be done. Shall the devise to charity wholly fail because the intention of the testator cannot be wholly performed? Or shall the manifest purpose of the testator to devote his estate to charity be executed *"cy pres,"* or as nearly as may be?

In the case of *Matter of MacDowell (Westchester Trust Co.* v. *Gibson),* 217 N. Y. 454, 112 N. E. 177, a testatrix had attempted to create a charitable trust which

could not be carried out because the fund provided was not sufficient for that purpose. SEABURY, J., for the Court of Appeals of New York, said: "The money that she directed be devoted to this purpose may be inadequate to carry out her purpose in the precise manner contemplated, but that fact of itself furnishes no reason why the class that she intended to aid should not receive the benefit of the aid which it was her intention to give. (*Jackson* v. *Phillips*, 14 Allen [Mass.] 539, 586; *Atty. Gen.* v. *Ironmongers' Co.*, 2 Beav. [Eng.] 313; *Norris* v. *Loomis*, 215 Mass. 344, 102 N. E. 419).

"No general rule can be enunciated as to the manner in which the *cy pres* doctrine will be applied. Each case must necessarily depend upon its own peculiar circumstances. Inadequacy of the trust fund to accomplish the purpose of the testator in the manner originally intended may, however, justify the scheme of the charity being changed. If the Supreme Court cannot cause this trust to be carried out in the precise manner contemplated by the testatrix it will apply the trust fund to other charities as nearly as possible like that specifically mentioned in the will. (*Sailors' Snug Harbor* v. *Carmody*, 211 N. Y. 286, 300, 105 N. E. 543)."

The case is annotated in Ann. Cas. 1917-E, 853, and at page 870 the note deals with the question of the inadequacy of the gift to maintain the charity attempted to be created. The case note is that "the inadequacy of a charitable trust fund for the establishment of a home for persons of a particular class does not in any way affect the validity of the gift," and among the cases cited is the case of *Kemmerer* v. *Kemmerer*, 233 Ill. 327, 84 N. E. 256, which case is itself found annotated in 122 Am. St. Rep. 169, where it was said: "In this State the statute of 43 Elizabeth, chapter 4, is a part of the common law (*Heuser* v. *Harris*, 42 Ill. 425; *Andrews* v. *Andrews*, 110 Ill. 223), and the efforts of the courts of this State have always been to sustain a gift for charity if it can be done, and while the courts of this State do not

assume to exercise the prerogative powers which the courts of England have at times exercised, if a trust for charity is sufficiently certain to enable the courts, in the exercise of their ordinary chancery powers, to carry out the donor's charitable intent, they will not allow the trust to fail (*Welch* v. *Caldwell*, 226 Ill. 488, 80 N. E. 1014); and the fact that the fund will be depleted one-half by reason of the fact that the widow has taken under the law and not under the will, will not defeat the trust (*Gilman* v. *Hamilton*, 16 Ill. 225), as other means may be donated toward the erection and maintenance of said orphans' home and the testator's object thereby fully accomplished."

This statute of 43 Elizabeth, chapter 4, was entitled: "An act to redress the misemployment of lands, goods and stocks of money heretofore given to certain charitable uses."

Judge U. M. Rose, as special judge in the case of *Fordyce* v. *Woman's Christian National Library Association*, 79 Ark. 550, said: "The English statute of 43 Eliz., c. 4, is in force in this State. In it schools and free schools are mentioned, but not libraries. The statute was, however, only remedial and ancillary, and did not affect in any wise the jurisdiction of the chancery court as it previously existed. *Ould* v. *Washington Hospital*, 95 U. S. 303; *Biscoe* v. *Thweatt*, 74 Ark. 545."

This English statute mentions the education and preferment of orphans and gifts for or towards their relief.

In the opinion by Judge Rose, *supra*, it was also said: "Devises for charitable purposes that are void at law are often sustained in chancery. 2 Story, Eq., sec. 1170. Where a literal execution of a charitable devise becomes inexpedient or impracticable, the court will execute it as nearly as it can according to the original purpose. *Id.*, sec. 1169. The court will supply all defects of conveyances where the donor has capacity to convey, unless the mode of donation contravenes some statutory provision. *Id.*, sec. 1171."

There are a vast number of cases which discuss and apply what is commonly called the *cy pres* doctrine, and the annotated cases herein cited collect many of them. See sec. 113 of the article on Charities in 5 R. C. L. at p. 370; *Tincher* v. *Arnold,* 147 Fed. 665. See also, note c, par. IV, to the case of *Hadley* v. *Forsee,* 14 L. R. A. (N. S.) 49; sec. 74 *et seq.* of article on Charities in 11 C. J. 358; *Grand Prairie Seminary* v. *Morgan,* 49 N. E. (Ill.) 516; *Grimke* v. *Malone,* 91 N. E. 899; 2 Perry on Trusts (6th Ed.) secs. 723, 725; 3 Story's Equity Jurisprudence, (14th Ed.) secs. 1557, 1571; *Mackenzie* v. *Trustees of Presbytery of Jersey City,* 3 L. R. A. (N. S.) 227; *Sailors' Snug Harbor* v. *Carmody,* 211 N. Y. 286, 105 N. E. 543.

A case in which the facts are very similar to those of the instant case is that of *Weeks* v. *Hobson,* 150 Mass. 377. In that case the donor had devised a certain lot of land "to be used as a site for a hospital," and the reasoning of that case is so applicable to the facts of this that we quote the following paragraph: "The original bill alleges that the land devised is not a suitable site for a hospital building. We can think of causes which may have come into existence since the will was made, or even since the death of the testator, which, combined with other causes inherent in the land, make it now an unsuitable place for a hospital, even though the testator might well have thought it suitable when he made his will. We must treat this allegation, and the decree founded on the evidence in support of it, as establishing the proposition that it is now impracticable to carry out the purpose of the testator in the precise mode which he contemplated. Since the trustees cannot properly build a hospital on the land devised, the question presented to the court is whether the charity must fail, and the property revert to the residuary legatees, or whether the court can apply the doctrine of *cy pres* and change the mode of disposing of the property so as to carry out the general purpose and intent of the testator. That depends

upon what we find to have been his intent in making the devise. It is to be noticed, first, that he makes a single gift of land and money, to be used for the establishment and maintenance of a hospital. The land is to be used as a site, and the money is to be expended in the erection of buildings and in defraying the current expenses of the hospital. His obvious purpose was to provide, and, to the extent of his gift, to maintain a hospital for the sick and maimed of the city of his residence. We cannot believe that he intended to make his gift dependent on the occupation of a particular lot as a site for the buildings, so that if it became impracticable or impossible to use that lot he would utterly fail to accomplish his purpose. His language indicates that he had in mind a charitable scheme of great importance to the people of the neighborhood, which involved the occupation of a lot by hospital buildings, but to which the location of the buildings in the place named, instead of some other proper place, was of no consequence.''

We have concluded therefore that the chancery court had jurisdiction to make the order directing the specific performance of the contract of sale, and that, pursuant to its right to supervise and control the administration of trusts, and to prevent the failure of the testator's purpose to devote his estate to charity, a proper order was made, and the decree is therefore affirmed.

McCULLOCH, C. J., (dissenting). All of the authority which the Grand Lodge, as trustee, possesses in regard to the property in controversy, and any interest which it has in the property is derived solely from the last will and testament of Shirey. Under the compromise with the widow and heirs the Grand Lodge was shorn of a great deal of its interest in a considerable portion of the property, but it derived no interest or benefit other than a settlement of the lawsuit. It received, under the terms of the agreement, no new interest in the land devised in trust by the will.

In the Shirey will there are two purposes clearly expressed; one to create a trust in the four hundred acres of land known as the Robbins farm, which was "to be used as a location and site for an orphans' home to be established and maintained thereof under the perpetual control of said grand lodge"; and the other to create a trust in the remainder of the property of the testator for the purpose of establishing a sanitarium to be located and maintained at the city of Hot Springs for the purpose of the treatment of certain diseases by certain methods and without the use of drugs.

There are now 2,100 acres of land held by the grand lodge under the will, including the four hundred acres constituting the Robbins farm. The declared purpose of the trustee now is to sell all of the property and devote the proceeds to the maintenance of an orphans' home at the city of Batesville, which prior to the death of Shirey had been established by the Grand Lodge. The right to dispose of the property for the purpose mentioned is the point at issue in the present litigation, and the majority of the court now sustain the asserted authority of the Grand Lodge under the principles known as the *cy pres*. doctrine—the doctrine of nearness or approximation.

The doctrine of *cy pres* originated in the common law of England as a part of the royal prerogative which the chancellor exercised by the sign-manual, and for obvious reasons this phase of the ancient doctrine has never obtained in America. The other, or judicial, phase of the doctrine, which was merely one of construction by courts of equity in order to effectuate the real intention of a testator, has always been admitted and freely exercised by the courts of this country. There are many decisions which give an interesting account of the origin, progress and limitations of this doctrine, notably the case of *Jackson v. Phillips*, 96 Mass. 539, which is cited in the majority opinion.

"This power of disposal by the sign-manual of the crown in direct opposition to the declared intention of

the testator,'' said the Massachusetts court in the case cited above, ''whether it is to be deemed to have belonged to the king as head of the church as well as of the State, * * * or to have been derived from the power exercised by the Roman Emperor, * * * is clearly a prerogative and not a judicial power and could not be exercised by this court; and it is difficult to see how it could be held to exist at all in a republic, in which charitable bequests have never been forfeited to the use or submitted to the disposition of the government, because superstitious or illegal.''

Another interesting discussion of the subject may be found in the opinion of the New Jersey court in *Mackenzie* v. *Trustees*, 67 N. J. Eq. 652, 3 L. R. A. (N. S.) 227.

The substance of the doctrine, as recognized by the American courts, is that the dominant purpose of the testator in the creation of a charitable trust will not be permitted by a court of equity to fail merely because of impossibility of its execution in the manner literally prescribed by the testator, and that other methods will be adopted in order to effectuate the general and dominant purpose of the testator.

In *Jackson* v. *Phillips, supra,* the Massachusetts court stated the scope of the enforcement of this doctrine in the following language:

''It is accordingly well settled by decisions of the highest authority, that when a gift is made to trustees for a charitable purpose, the general nature of which is pointed out, and which is lawful and valid at the time of the death of the testator, and no intention is expressed to limit it to a particular institution or mode of application, and afterwards, either by change of circumstances the scheme of the testator become impracticable, or by change of law become illegal, the fund, having once vested in the charity, does not go to the heirs at law as a resulting trust, but is to be applied by the court of chancery, in the exercise of its jurisdiction in equity, as near the tes-

tator's particular directions as possible, to carry out his general charitable intent."

The same court, in a later case (*Teele* v. *Bishop of Derry*, 168 Mass. 341), stated the doctrine and its limitations as follows:

"If it appears from the will that the intention of the testatrix was that her property should be applied to a charitable purpose whose general nature is described so that a general charitable intent can be inferred, then if, by a change of circumstances or in the law, it becomes impracticable to administer the trust in the precise manner provided by the testatrix, the doctrine of *cy pres* will be applied in order that the general charitable intent which the court regards as the dominant one may not be altogether defeated. * * * But if the charitable purpose is limited to a particular object or to a particular institution, and there is no general charitable intent, then, if it becomes impossible to carry out the object, or the institution ceases to exist before the gift has taken effect, the doctrine of *cy pres* does not apply, and, in the absence of any limitation over or other provision, the legacy lapses."

In a decision of the Kentucky Court of Appeals, Chief Justice ROBERTSON, speaking for the court, said:

"We as satisfied that the *cy pres* doctrine of England is not, and should not be, a *judicial* doctrine, except in one kind of case; and that is, where there is an available charity to an identified or ascertainable object, and a particular mode, inadequate, illegal, or inappropriate, or which happens to fail, has been prescribed. In such a case a court of equity may substitute or sanction any other mode that may be lawful and suitable, and will effectuate the *declared* intention of the donor, and not arbitrarily and in the dark, *presuming* on his motives or wishes, *declare an object for him.* A court may act judicially as long as it effectuates the lawful intention of the donor. But it does not act judicially when it applies his bounty to a specific object or charity, selected by

itself merely because he had dedicated it to charity generally, or to a specified purpose which cannot be effectuated." *Moore* v. *Moore,* 4 Dana (Ky.) 354.

In the New Jersey case cited above (*Mackenzie* v. *Trustees*), the court said this:

"In all of these instances it is to be observed that the underlying principle is this: Where the testator or donor had two objects in view, one primary or general, and the other secondary or particular, and these are, literally speaking, incompatible, the particular object must be sacrificed in order that effect may be given to the general object according to law and 'as near as may be' to the testator's or donor's intention."

According to the test prescribed in these decisions of courts of the highest respectability, and upon which the majority seem to rely in reaching their conclusion, the *cy pres* doctrine is inapplicable to the facts of the present case. There cannot be discovered in the langauge of the testator or a general purpose other than in the manner expressed in the will, to create a charity in the way of caring for the widows and orphans of members of the fraternity. The only declared purpose is the specific one of establishing a home upon a particular tract of land. There is no general provision for the establishment of an orphans' home, nor is there any provision at all for the maintenance of the home. The language of the devise is susceptible only to the interpretation that the testator had in mind solely the location of an orphans' home upon the site in question, to be operated and controlled by the fraternity mentioned, as trustee; therefore, there was no general charitable intent to which the specific intent with regard to methods or means for its performance must yield. It is not a case like the one relied on by the majority (*Weeks* v. *Hobson,* 150 Mass. 377), where not only the location of the home was provided, but the means for its operation were also provided, and the court held that the trust did not fail merely because the selected location was unsuitable. In the present

case the testator merely provided for the location, and his design ended with that provision.   The sale of the property and the devotion of the proceeds to another purpose, even though it be a charity of the same general nature, was not within the design of the testator, and therefore it is not within the power of the court to set at naught his design and use the funds for some other purpose of the same general nature.   The facts of the case, I think, fall squarely within the limitation placed upon the doctrine by the Massachusetts court in *Teele* v. *Bishop of Derry, supra.*

What I have said has reference solely to the application of this principle to the four-hundred acre tract known as the Robbins farm.   But, conceding that the doctrine applies as to that part of the property so as to permit the sale for use in the maintenance of an orphans' home, it is entirely beyond me to discover any proper application of the doctrine which would permit the trustee to dispose of the property which was specifically devised by the testator for the purpose of establishing a sanitarium at Hot Springs and devote the proceeds to an orphans' home in Batesville.   It seems to me that the decision, to that extent, goes the full limit of the ancient doctrine of *cy pres* which the English chancellor long ago exercised under the royal prerogative.   No American court has ever gone that far, and I am therefore unable to join the judges in the decision which holds that the Grand Lodge has the authority to use this property or to dispose of it for any purpose other than that prescribed in the Shirey will.